UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GLENN J SCHIAFFINO                                CIVIL ACTION NO.

v

CANNON COCHRAN MANAGEMENT              JUDGE:
    SERVICES, INC                                  Magistrate Judge:

# COMPLAINT

## Jurisdiction and venue

1. This matter is brought under 42 USC sec 2000e(5) and jurisdiction is laid under 28 USC sec 1343. Supplemental jurisdiction is pled as to the state law claim under La. RS 23: 631&632 [unpaid last wages (accrued vacation pay)]. Venue in this district is proper because all acts complained of occurred in this district.

## Parties

2. Plaintiff, Glenn J Schiaffino, was employed as Claims Consultant in defendant's Metairie, La office from August 2007 to March 24, 2014 when he resigned because of unreasonable working conditions in the Metairie office. He was earning about $58,000/yr. Defendant, Cannon Cochran Management Services, Inc. (CCMSI), is a Third-Party Administrator for self-insured clients with claims against them. It is a nation wide company and employs over 500 people.

## Right-to-sue

3. Plaintiff received a Right-to-sue letter dated July 1, 2014 with regard to an EEOC charge which alleged supervisory sexual harassment, supervisory retaliatory harassment, and constructive discharge.

## Count 1 - Supervisory sexual harassment

4. Plaintiff was in a group of 8 employees, of which 4 were females and 4 were

males. This group had two supervisors, both females. There were 10 other similar groups (all with only one supervisor), 9 of which were supervised by a female. That is, of the 12 supervisors, 11 were female and one was male.

5. Above this level, there was a female, Donnel Langley (w/f), Claims Supervisor who was over the 12 managers and the adjusters, including plaintiff, in the 12 groups. Above Ms Langley was Karen Thurman (w/f). Both these ladies were at the Metairie site.

6. The harassment began when Karen Bonnet became plaintiff's sole supervisor, possibly in early 2010. In @ late 2012 Lisa Poppe was appointed a "co-supervisor" of plaintiff's group and he began to report more directly, but not completely, to her. That is, he reported to both. This was because plaintiff's case load included cases shared with both Bonnet and Poppe.

7. Under Bonnet and Poppe, the harassment consisted of their taking a two-hour lunch while plaintiff could not be a minute late in returning from lunch. The females in plaintiff's group, including Bonnet and Poppe, were also accorded the privilege of longer lunch breaks or, if they skipped lunch, leaving early. Plaintiff was threatened with write-ups for being late to return from lunch, and was barred from leaving early. When he complained about Bonnet and Poppe to Langley, she told him that their leaving was a privilege of management, but when he checked with Thurman,, she stated that they were "all equal." Nevertheless, these practices continued until his last day of work. They were pervasive.

8. In the background there were other forms of discriminatory and harassing treatment related to gender. For example, Langley would consistently greet the females when arriving in the morning, but ignore the men; she would take the females to lunch, but not the men; she would buy the females Christmas and birthday gifts, but not the men.

## Count 2- Supervisory retaliatory harassment

9. After plaintiff complained about the females' lunch periods, Bonnet suddenly increased his case load to a considerably higher level and to the highest in his group, if not all 11 claims groups. This practice of assigning plaintiff a heavier case load, mostly recently in the form of assigning him new files in place of files ready to be closed, continued to his last day of work. This

practice was pervasive.

10. Poppe would put supervisory notes in his files to the effect that he had missed deadlines to notify excess carriers, etc, but would notify female adjusters that they were about to miss deadlines and would not put such notes in their files which would allow them to give timely notice. This practice continued to his last day of work. This practice was pervasive.

11. In September 2013 plaintiff went to the office of Langley, then Thurman, to complain that there was a different set of rules for women in the office as opposed to men. Both denied this.

12. The write-up practice included an unwarranted negative performance appraisal by Poppe and Langley shortly afterwards in October 2013. This was his first negative appraisal. He alleges that it was in retaliation for his previous complaints about gender discrimination.

13. Plaintiff complained unsuccessfully about this appraisal to Thurman and HR.

13A. He then went to his PCP who referred him to a psychiatrist. Both doctors found him disabled and recommended that he take leave.

14. Two days later he took FMLA under a Short-term Disability policy until @ January 7, 2014. Although he had been under increased stress since April 2013 because of the unexpected death of his mother, defendant's actions were the precipitation cause for taking the FMLA.

15. At the end of his 90-day FMLA protected absence, he returned to work @ January 7, 2014 (against medical advice, not withstanding a release). The retaliatory harassment got worse in that Poppe documented an increasing number of alleged work deficiencies and revoked her approval for plaintiff to leave early for the balance of his daughter's basketball season. He complained to Langley about the treatment of Poppe and Bonnet.

16. The above instances of harassment and retaliation also continued. The illegal harassment was now pervasive and severe.

### Count 3- Constructive discharge

17.    Despite repeated complaints, plaintiff got no relief and the hostility increased upon his return.  He reasonably concluded he would get no relief and so resigned March 24, 2014.  Plaintiff contends that he was constructively discharged.

### Count 4-State law claim for unpaid last wages

18.    The above count is re-asserted here under La RS 23: 631 et seq.  When plaintiff resigned, he asked for his accrued vacation pay (three weeks, over $3,000), but defendant refused.  The refusal was arbitrary such that defendant is liable for penalty wages equal to 90 days of plaintiff's daily salary.

### Relief sought

Under Counts 1 -2, plaintiff seeks damages for emotional distress and punitive damages;
Under Count 3, plaintiff seeks damages for emotional distress and lost income and punitive damages;
Under Counts 4, plaintiff seeks the accrued vacation pay with interest and 90 days penalty wages; and
Under all counts, plaintiff seeks attorney fees, costs, and trial by jury.

Respectfully submitted,
/s/ J Courtney Wilson 13561
J Courtney Wilson
1510 Veterans Blvd
Metairie, La 70005
(T) 504/832-0585
(F) 504/846-2400
E/m cwilson@courtlaw.net

PLEASE DO NOT ISSUE SUMMONS
NOTICE AND WAIVER WILL BE ATTEMPTED